J-S41016-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF G.E., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.E., FATHER | No. 375 MDA 2015 |

Appeal from the Order Entered January 27, 2015
In the Court of Common Pleas of Dauphin County
Orphans' Court at No(s): 114 AD 2014
CP-22-DP-0000009-2013

\*\*\*\*\*

| | |
|---|---|
| IN THE INTEREST OF J.E., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.E., FATHER | No. 376 MDA 2015 |

Appeal from the Order Entered January 27, 2015
In the Court of Common Pleas of Dauphin County
Orphans' Court at No(s): 115 AD 2014
CP-22-DP-0000004-2013

\*\*\*\*\*

| | |
|---|---|
| IN THE INTEREST OF S.E., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.E., FATHER | No. 377 MDA 2015 |

Appeal from the Order Entered January 27, 2015
In the Court of Common Pleas of Dauphin County
Orphans' Court at No(s): 113 AD 2014

IN THE INTEREST OF P.E., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA

APPEAL OF: S.E., FATHER

No. 378 MDA 2015

Appeal from the Order Entered January 27, 2015
In the Court of Common Pleas of Dauphin County
Orphans' Court at No(s): 112 AD 2014

*****

IN THE INTEREST OF D.E., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA

APPEAL OF: S.E., FATHER

No. 379 MDA 2015

Appeal from the Order Entered January 27, 2015
In the Court of Common Pleas of Dauphin County
Orphans' Court at No(s): 111 AD 2014
CP-22-DP-0000010-2013

*****

IN THE INTEREST OF H.E., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA

APPEAL OF: S.E., FATHER

No. 380 MDA 2015

Appeal from the Order Entered January 27, 2015
In the Court of Common Pleas of Dauphin County
Orphans' Court at No(s): 110 AD 2014
CP-22-DP-0000012-2013

J-S41016-15

IN THE INTEREST OF F.E., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA

APPEAL OF: S.E., FATHER

No. 381 MDA 2015

Appeal from the Order Entered January 27, 2015
In the Court of Common Pleas of Dauphin County
Orphans' Court at No(s): 107 AD 2014
CP-22-DP-0000008-2013

*****

IN THE INTEREST OF N.E., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA

APPEAL OF: S.E., FATHER

No. 382 MDA 2015

Appeal from the Order Entered January 27, 2015
In the Court of Common Pleas of Dauphin County
Orphans' Court at No(s): 108 AD 2014
CP-22-DP-0000006-2013

*****

IN THE INTEREST OF J.E., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA

APPEAL OF: S.E., FATHER

No. 383 MDA 2015

Appeal from the Order Entered January 27, 2015
In the Court of Common Pleas of Dauphin County
Orphans' Court at No(s): 109 AD 2014

J-S41016-15

BEFORE: ALLEN, J., LAZARUS, J., and PLATT, J.[*]

MEMORANDUM BY LAZARUS, J.:                    **FILED JULY 08, 2015**

S.E. (Father) appeals from the trial court's order granting a goal change to adoption and involuntarily terminating his parental rights[1] to his nine minor children, J.S.E., G.E, S.E., P.E, D.E., H.E., J.J.E., N.E., F.E.[2] (collectively, Children), ages 4, 6, 7, 9, 11, 12, 14, 15 and 17, respectively. After careful review, we affirm.

Father and Mother are the parents of 16 children; nine of the sixteen are the subject of this termination appeal. Father is a Fundamentalist Christian whose beliefs center around his supreme authority and the absolute requirement that his family submit to his strict interpretation of the Bible. From 2007 to 2011, Dauphin County Social Services for Children and Youth (CYS) received referrals that Children's needs were not being met at home; those deficiencies included lack of food, heat and running water. In August 2012, CYS received a referral that some of the Children were having

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] We review a trial court's decision to involuntarily terminate parental rights for an abuse of discretion or error of law. *In re A.R.*, 837 A.2d 560, 563 (Pa. Super. 2003). Our scope of review is limited to determining whether the trial court's order is supported by competent evidence. *Id.*

[2] Another of Father's children, B.E., was born in September 2011 with minimal brain activity following a home birth. Father and Mother voluntarily terminated their parental rights to B.E. on June 29, 2012, based upon their inability to parent a child with special needs and the fact that Mother also had 15 other children at home.

- 4 -

suicidal thoughts as a result of Father's behavior, that Father had been physically aggressive toward one of his adult sons, and that Mother fled to a motel with 10 of the Children due to the disturbing domestic situation at home. In November 2012, CYS received another referral regarding Children and their relationship with Father. Days later, Mother asked CYS to take custody of Children after she was diagnosed with terminal breast cancer. On December 7, 2012, Mother and Father met with CYS and agreed to have Children temporarily reside with Charles B. and Elizabeth B. (the B's).

On December 10, 2012, Mother moved in with maternal grandmother where she received hospice care, due to a decline in her health. On January 29, 2013, Children were adjudicated dependent and placed under court-ordered third-party protective supervision with the B's. Mother passed away on February 28, 2013. In March 2013, CYS received another referral that F.E. was the victim of emotional abuse at the hands of Father; Father was indicated for emotional abuse of F.E. On June 13, 2013, CYS took custody of Children. Children were divided among three kinship homes, one of those being the B's.[3] While Children were in the kinship homes, the court ordered weekly supervised visitation between Father and CYS facilitated family group conferences.

_____

[3] Specifically, J.J.E., N.E. and J.S.E. remained with the B's, F.E. and H.E. moved into the G's home and P.E., G.E., D.E., and S.E. moved in to the U's home.

CYS listed the following service objectives for Father with regard to reunification: (1) cooperate and comply with Agency; (2) attend all court hearings, Agency meetings, and treatment plan meetings; (3) sign all release information forms requested by Agency to ensure compliance in meeting identified service objectives; (4) notify Agency within 24 hours of any new residence or contact information; (5) obtain a psychological evaluation and follow through with any recommendations; (6) provide Agency with medical documentation regarding his physical condition to determine his capability of meeting Children's needs; (7) participate in and comply with reunification services provided by Agency; (8) display knowledge and understanding of each child's educational needs and requirements and establish a plan to fulfill those needs; (9) demonstrate ability to feed Children appropriately; (10) demonstrate knowledge of appropriate medical care for Children;[4] (11) demonstrate ability to read and respond to Children's physical and emotional needs; (12) establish reasonable rules and expectations for each child; (13) provide nurturing, loving environment in which Children feel welcomed and valued; (14) demonstrate above skills during visitation with Children; (15) participate in bonding assessment; and (16) complete parenting class.

---

[4] Father testified that he "was kind of the doctor of the house. So whatever happened, I always felt and told the children the Lord gives us what we need." N.T. Termination Hearing, 1/27/2015, at 128.

Six permanency review hearings were held over the course of twelve months, from June 2013 through June 2014. When Father was unsuccessful in fulfilling the goals of the Agency's service plan, CYS filed nine separate petitions, in November 2014, to involuntarily terminate Father's parental rights to Children, pursuant to 23 Pa.C.S. §§ 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b) of the Adoption Act.[5] On January 27, 2015, the court held a termination hearing, after which it granted the petitions. This appeal follows.

On appeal, Father presents the following issues for our review:

(1) Whether the trial court abused its discretion by determining that Father's parental rights should be involuntarily terminated to the minor children.

(2) Whether the trial court erred by determining that the best interest[s] of the Child[ren] would be served by involuntarily terminating Father's parental rights.

In his first issue on appeal, Father contends that the trial court erroneously concluded that he "showed a settled purpose to relinquish his parental claim." Appellant's Brief, at 38. Father supports this contention by claiming that he has attended every visit with Children since they have been removed from his care, has made every effort to see his children and have them returned to the family residence, and that CYS "tricked him into voluntarily removing the [C]hildren from the household." *Id.* at 39.

---

[5] 23 Pa.C.S. §§ 2101-2938.

CYS caseworker Morgan Goodling testified that three or four of the nine children regularly attended weekly visits with Father. N.T. Termination Hearing, 1/27/2015, at 20. The remaining children did not wish to visit with Father because they were afraid of him due to his aggressive and abusive behaviors. *Id.* at 19. Goodling testified that Father took no responsibility for his actions and blamed the children's negative feelings toward him on their deceased Mother being manipulative and Father's adult children. When the Children were initially placed with the B's, a majority of the Children needed extensive dental work, two of the Children required medical testing beyond routine physical examinations, N.E. needed medication and treatment for his Lyme Disease and arthritis, all Children were behind educationally, several Children had mental health issues, and three of the Children needed to be tested for learning disabilities. *Id.* at 18.

At the termination hearing, CYS admitted a psychological evaluation of Father conducted by Howard S. Rosen, PhD., a clinical psychologist.[6] Dr. Rosen diagnosed Father with antisocial personality disorder, recommending individual therapy with a focus on problem solving skills and anger management. Specifically, Dr. Rosen found that Father "lacks empathy and tends to be callous, cynical, and contemptuous of the feelings, rights and sufferings of other. He has an inflated and arrogant self-appraisal [and]

---

[6] Dr. Rosen also testified at the June 13, 2013 permanency review hearing with regard to his psychological evaluation of Father.

tends to be irresponsible and exploitative." Psychological Evaluation, 4/11/13, at 6. Dr. Rosen also noted that the recommended therapy has poor efficacy and that at least a year of therapy will be necessary to notice any change in Father's behaviors. Father's progress with his recommended therapy "stagnated," N.T. Permanency Review Hearing, 9/16/2013, at 10, and he stopped receiving outpatient mental health services in November 2013 after more intensive services were recommended. Father did not agree with the recommendation and, as a result, did not seek intensive group therapy. Father did, however, begin outpatient therapy again in February 2014 and was still attending on a weekly basis at the time of the termination hearing.

Candra Chang, a family therapist who provided reunification services to Father, testified that she made no progress with Father as he denied any need for her services, demeaned the therapy team, and continued to place blame for Children's issues on his deceased wife and CYS. **See** Pressley Ridge Closing Summary, 1/6/2014, at 283-85; **see also** N.T. Permanency Review Hearing, 1/9/2014, at 56-57. Larry Steward, a family services worker, testified that Father "repeatedly insulted and ridiculed . . . providers, had difficulty remaining focused on his goal plan . . . and has not been engaged in the change process." Keystone & Family Services Family Preservation/Reunification Services Goal Development Plan/Service Support Plan, April-May 2014, at 291. Steward also noted that Father has severe mental health issues that impede his ability to "have appropriate dialogue to

make a real plan for the safety of his children coming back into his care." N.T. Permanency Review Hearing, 6/3/2014, at 45. Additionally, CYS permanency caseworker, Eric Walters, testified that when he attempted to review the family service and Children's permanency plans with Father, Father went off topic and said that his rights had been violated because he did not have a part in developing the service plan. *Id.* at 70-71. Father, who "[did] not take ownership of his behavior" *id.* at 72, failed to make any progress with Walters.

All in all, Father has refused to take responsibility for how his actions and emotionally abusive behavior have negatively impacted Children. He has not demonstrated that he is capable of properly parenting Children. F.E. testified at the termination hearing that she hates Father. N.T. Termination Hearing, 1/27/2015, at 10. After being in the B's home for six months, Children still remained fearful of Father. *Id.* at 26.

> In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

*In re adoption of S.M.*, 816 A.2d 1117, 1122 (Pa. Super. 2003) (citation omitted). *See also In C.P.*, 901 A.2d 516, 520 (Pa. Super. 2006) (party

seeking termination of parental rights bears burden of proving by clear and convincing evidence that at least one of eight grounds for termination under 23 Pa.C.S. § 2511(a) exists and that termination promotes emotional needs and welfare of child set forth in 23 Pa.C.S. § 2511(b)).

Here, we find that the trial court properly terminated Father's parental rights pursuant to section 2511(a)(2). Although Father may have agreed to complete several of CYS's service objectives and regularly attended scheduled visitations with Children, his combative and hostile attitude with regard to the services offered him and consistent deflection of any blame for Children's emotional, social and educational issues support CYS's conclusions that: Father failed to positively progress toward the goal of reunification; Father's abusive actions toward Children continue to exist; and, most critically, Father is incapable of parenting Children. ***See*** 23 Pa.C.S. § 2511(a) (2) (termination appropriate where "repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.").[7]

_____

[7] We can affirm the trial court's decision regarding the termination of parental rights with regard to any singular subsection of section 2511(a). ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (en banc).

Father next contends that the trial court erred in concluding that terminating his parental rights is in the best interest of the Children, pursuant to section 2511(b) of the Adoption Act. Again, we disagree.

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M*., 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

Father provides no legal argument to support his claim that the trial court erroneously concluded that termination was proper under section 2511(b). His sole argument consists of the following four sentences:

> As was stated in the proceedings, the children continued to struggle while at the B['s] household. The caseworkers had to hold meetings with all the children because they continued to have educational concerns. The trial court overlooks the fact the Agency assisted the [] B['s] in caring for the children in an effort to assist the children in their education. If Father had the same level of commitment by the Agency with the children in his household, the children would be where they are today.

Appellant's Brief, at 46-47.

A section 2511(b) analysis consists of a determination as to whether termination will serve the needs and welfare of the child, giving primary

consideration to the emotional bonds between the parent and child. *In re K.K.R. S.*, 958 A.2d 529, 533 (Pa. Super. 2008). Father's argument centers around the services provided to the B's; he makes no mention of any bond he has with Children or what effect severing that bond would have on Children.

Despite Father's misplaced argument, the record clearly demonstrates that severing any bonds, were they even to exist, would be in the Children's best interests. As the trial court notes, "the children were so emotionally abused by Father that they would run to the second floor of the home to escape him when he would lose his temper and [] the children would avoid being around him." Trial Court Opinion, at 35. Moreover, the court stated that "the children had no conception of three meals a day [when they lived with Father]. [In fact,] one of the children told [Mrs. B] that they liked living [with her] because she feeds them." *Id.* at 36. *See In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (intangibles such as love, comfort, security, and stability are involved in section 2511(b) needs and welfare of child inquiry). Here, we believe that termination of Father's rights will not negatively affect Children. Since being placed into foster care, Children are up-to-date on their medical and dental appointments, are making strides in their education, are emotionally bonding to their foster parents, and their essential needs are being met.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/8/2015